IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RHONDA CLEMMER and DONNA REDDOUT, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | Case No. CIV-13-1335-C |
| THE DISTRICT OF COLUMBIA GROUP, INC., a District of Columbia Corporation, and MARTIN ARASE, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

On June 1, 2010, Plaintiffs Rhonda Clemmer and Donna Reddout entered into an agreement (the "Stock Purchase Agreement") to sell their 100% stock interest in Eagle Systems and Services, Incorporated ("Eagle") to Defendant The Columbia Group, Inc. ("TCG"). The purchaser, Defendant TCG, agreed to pay Plaintiffs a base consideration of $10,000,000.00 up front. (Defs.' Br. in Supp. of Mot. to Dismiss, Dkt. No. 15, Ex. 1 at 21.) Additionally, the Stock Purchase Agreement contemplated additional contingent "earn out" payments of up to $4,800,000.00. (Id., Ex. 1 at 22.) Plaintiffs' entitlement to the earn out payments depended on Eagle's gross revenue reaching certain benchmarks within the applicable periods of twelve, twenty-four, and thirty-six months after the sale. Defendant TCG warranted that it would carry on Eagle's "business substantially in the usual, regular and ordinary course consistent with past practice" and would not "impair the ability of [Eagle] to meet or exceed the Applicable Benchmarks for purposes of determining the Earn Out" payments to Plaintiffs. (Id., Ex. 1 at 67-68.)

The parties do not dispute that TCG paid Plaintiffs the $10,000,000.00 up-front price and an earn out payment of $1,974,605.00 after Eagle's gross revenue met the agreed-upon twelve-month benchmark. Plaintiffs contend, however, that Defendants TCG and Martin Arase, TCG's president, failed to pay Plaintiffs the $975,285.00 earn out payment due for the twenty-four month period, or the $1,850,110.00 earn out payment owed at the conclusion of the thirty-six month period after the sale. Plaintiffs also claim that TCG and Arase took actions that breached the representations and warranties in the Stock Purchase Agreement, including making certain distributions and failing to disclose a prior conflicting agreement. Accordingly, Plaintiffs filed this suit against Defendants TCG and Arase for breach of contract. Additionally, Plaintiffs contend that Defendants TCG and Arase committed fraud in the inducement during negotiation of the Stock Purchase Agreement. Defendants now move to dismiss Plaintiffs' fraud claims and Plaintiffs' alter ego claim against Defendant Arase for failure to state a claim upon which relief may be granted under Fed. R. Civ. P. 12(b)(6) and (9)(b).

## I. LEGAL STANDARD

Dismissal under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted is only appropriate "'when it appears that the plaintiff can prove no set of facts in support of the claims that would entitle the plaintiff to relief.'" Clark v. State Farm Mut. Auto. Ins. Co., 319 F.3d 1234, 1240 (10th Cir. 2003) (quoting McDonald v. Kinder-Morgan, Inc., 287 F.3d 992, 997 (10th Cir. 2002)). In other words, Plaintiffs' Complaint must contain "enough facts to state a claim to relief that is plausible on its face" or "enough

to raise a right to relief above the speculative level." Bell Atl. v. Twombly, 550 U.S. 544, 555, 570 (2007). Although Twombly requires only notice pleading, Fed. R. Civ. P. 9(b) imposes a heightened pleading standard for claims of fraud. To comply with Rule 9(b), Plaintiffs' Complaint "must state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), or "identify the time, place, content, and consequences of the fraudulent conduct." U.S. ex rel. Lemmon v. Envirocare of Utah, Inc., 614 F.3d 1163, 1171 (10th Cir. 2010). At the dismissal stage, the Court will accept all of Plaintiffs' well-pleaded factual allegations as true and view them in the light most favorable to Plaintiffs. Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210, 1215 (10th Cir. 2007).

## II. ANALYSIS

### A. Alter Ego Liability

Because the Stock Purchase Agreement that forms the basis of Plaintiffs' claims was between Plaintiffs and Defendant TCG, not Defendant Arase, Plaintiffs seek to hold Defendant Arase personally liable under an alter ego or corporate veil-piercing theory. Veil piercing "is an equitable remedy" which "hold[s] a shareholder, officer or director personally liable for an obligation of the corporation." Ag Servs. of Am., Inc. v. Nielsen, 231 F.3d 726, 736 (10th Cir. 2000). The test courts use to decide whether to pierce the veil varies depending on what substantive law applies. Here, the parties disagree over whether the laws of Oklahoma or the District of Columbia govern the veil-piercing analysis. The Court must thus engage in a choice of law analysis before examining whether it is appropriate to pierce

3

Defendant TCG's corporate veil and hold Defendant Arase personally liable for TCG's purported breach of contract and fraud.

1. Choice of Law

When there is a dispute as to what law applies to a veil-piercing analysis, the Court must first analyze whether there is a conflict between the potentially applicable bodies of law. Bd. of Cnty. Comm'rs of the Cnty. of Kay, Okla. v. Freeport-McMoran Copper & Gold, Inc., Case No. CIV-12-601-C (W.D. Okla. Sept. 5, 2013) (unpublished); see also Cyprus Amax Minerals Co. v. TCI Pac. Commc'ns., Inc., Case No. 11-CV-252-GKF-PJC, 2012 WL 4006122, at *2 (N.D. Okla. Sept. 12, 2012); Canal Ins. Co. v. Montello, Inc., 822 F. Supp. 2d 1177, 1181 (N.D. Okla. 2011). In this case, that means determining whether the substantive law of Oklahoma, where this action was brought, and the District of Columbia, Defendant TCG's state of incorporation, conflict. If no conflict exists, the Court will apply Oklahoma law. If there is a conflict between the two laws, Oklahoma's choice of law rules will govern whether the Court applies the substantive veil-piercing law of Oklahoma or the District of Columbia. Canal, 822 F. Supp. 2d at 1181.

Oklahoma law recognizes that "[g]enerally, a corporation is regarded as a legal entity, separate and distinct from the individuals comprising it." Fanning v. Brown, 2004 OK 7, ¶ 16, 85 P.3d 841, 846. But Oklahoma permits courts to "disregard the corporate entity and hold stockholders personally liable for corporate obligations or corporate conduct under the legal doctrines of fraud, alter ego and when necessary to protect the rights of third persons and accomplish justice." Id. Stated another way, Oklahoma law uses a disjunctive standard

4

and authorizes veil piercing if a plaintiff shows "either '(1) that the separate corporate existence is a design or scheme to perpetrate fraud, or (2) that [the] corporation is so organized and controlled and its affairs so conducted that it is merely an instrumentality" or alter-ego of the shareholder. King v. Modern Music Co., 2001 OK CIV APP 126, ¶ 16, 33 P.3d 947, 952 (emphasis added); see also Cyprus Amax Minerals, 2012 WL 4006122 at *2 (noting "Oklahoma's test for veil-piercing is stated in the disjunctive").

In contrast, the District of Columbia law uses a conjunctive standard. Under District of Columbia law, "a party may be permitted to pierce the corporate veil upon proof that there is (1) unity of ownership and interest, and (2) use of the corporate form to perpetrate fraud or wrong." Estate of Raleigh v. Mitchell, 947 A.2d 464, 470 (D.C. 2008) (internal quotation marks and citations omitted) (emphasis added). Piercing is done only "rarely and on a case-by-case basis when the facts demonstrate" the two-part test has been met. World Class Constr. Mgmt. Grp. v. Baylor, 962 F. Supp. 2d 296, 300 n.5 (D.D.C. 2013). Thus, a conflict exists between the relevant bodies of law. See Canal, 822 F. Supp. 2d at 1183 (finding "a clear distinction between Oklahoma and Indiana law regarding the piercing of the corporate veil: Oklahoma law requires the party attempting to pierce the corporate veil to demonstrate either (1) the corporate scheme is a design to perpetrate a fraud or (2) [the] corporation is merely an instrumentality of the [shareholder] while Indiana law requires the plaintiff to meet the more onerous standard of demonstrating both (1) [the] corporation was merely an instrumentality of [the shareholder], and (2) the misuse of the corporate form would

5

constitute a fraud or promote injustice") (internal quotation marks and citations omitted) (emphasis original).

Because a conflict of laws exists, the Court must decide the choice of law issue. Courts use the forum state's choice of law rules—here, Oklahoma—in diversity actions. Id. at 1183. Oklahoma courts have not specifically addressed the issue of what law to apply in determining whether to pierce a corporate veil. However, this Court has previously determined that the Oklahoma Supreme Court would most likely also look to the Restatement (Second) of Conflicts of Law to decide what substantive law to apply. Bd. of Cnty. Comm'rs, Case No. CIV-12-601-C; see also Cyprus Amax Minerals, 2012 WL 4006122 at *3-4; Tomlinson v. Combined Underwriters Life Ins. Co., Case No. 08-CV-259-TCK-FHM, 2009 WL 2601940 at *1-2 (N.D. Okla. Aug. 21, 2009). Accordingly, the Court looks to the Restatement (Second) of Conflicts of Law to resolve the veil-piercing issue.

The Restatement (Second) of Conflicts of Law contains two provisions that might apply to a choice of law analysis in the context of corporate veil piercing. Section 307 provides that "[t]he local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability to the corporation for assessments or contributions and to its creditors for corporate debts." However, for "[i]ssues involving the rights and liabilities of a corporation," § 302 instead directs the Court to apply "the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties." Section 302 continues by stating that ordinarily, "[t]he local law of the state of incorporation" will apply, "except in the unusual case where, with

respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties."

It is unclear whether § 302's "most significant relationship" test or § 307's place of incorporation rule should apply to a veil-piercing analysis, although the Northern District of Oklahoma recently rejected a plaintiff's arguments in favor of § 302 and instead applied § 307, holding "Section 307 squarely addresses the issue of what state's law governs shareholders' liability." Cyprus Amax Minerals, 2012 WL 4006122 at *4-5. Fortunately, the Court does not have to decide today whether § 302 or §307 should govern the veil-piercing analysis because both warrant the same result: the substantive law of the District of Columbia, TCG's place of incorporation. Section 307 clearly applies the law of the state of incorporation. Similarly, as noted by the court in Cyprus Amax Minerals Co., "to the extent § 302 is relevant, it provides that the law of the state of incorporation controls except in the 'unusual case' in which some other state has a more significant relationship to the occurrence and the party." Id. at *5. This case is not one of those "unusual cases" qualifying for an exception to the general state-of-incorporation rule. Although the parties' domiciles are split between Oklahoma and the District of Columbia, the "occurrence"—the alleged control of TCG by Arase—weighs in favor of applying the law of the District of Columbia, the place of TCG's incorporation.[1]

---

[1] The Court agrees with Judge Frizzell's "occurrence" analysis in Cyprus Amax Minerals: "Plaintiff's § 302 analysis assumes contamination is the 'occurrence' referenced in § 302(2). However, the particular issue before the court is not contamination, or even what entities or parties can ultimately be held liable for it. Rather, at issue here is which state's law should apply to veil piercing, and the 'occurrence' is the alleged control of TFMC by its

7

2. Application of Veil Piercing Test

Under District of Columbia law, the first step in a veil-piercing analysis is to determine whether a corporation and its shareholders are alter egos, or whether "there is . . . unity of ownership and interest." Estate of Raleigh, 947 A.2d at 470. Courts look at a variety of factors when considering "whether the corporation is the alter ego of its shareholders," including "(1) whether corporate formalities have been disregarded, (2) whether corporate funds and assets have been extensively intermingled with personal assets, (3) inadequate initial capitalization, and (4) fraudulent use of the corporation to protect personal business from the claims of creditors." Id. at 470-71 (internal citations omitted). Although the Court accepts Plaintiffs' well-pleaded factual allegations as true at the dismissal stage, Alvarado, 493 F.3d at 1215, Plaintiffs have not sufficiently pled a claim for veil piercing under District of Columbia law. In their Complaint, Plaintiffs did not allege that Defendant TCG failed to follow corporate formalities, that there was extensive intermingling of TCG's and Defendant Arase's assets, that TCG was initially undercapitalized, or that Arase fraudulently used TCG's corporate entity to protect his personal business from the claims of his creditors. Plaintiffs merely allege that Defendant TCG made a distribution to Defendant Arase, despite contrary terms in the Stock Purchase Agreement TCG entered into with Plaintiffs. (See Compl., Dkt. No. 1, at 8-9.) Although Plaintiffs also claim Defendant Arase "controlled and dominated" TCG, they do not provide

---

shareholders and/or NJ Zinc." Id.

any facts demonstrating control or domination, other than the complained-of distribution. (Id. at 9); compare McWilliams Ballard, Inc. v. Broadway Mgmt. Co. Inc., 636 F. Supp. 2d 1, 4 (D.D.C. 2009) (finding "plaintiff's allegations . . . sufficient to support a plausible inference" that defendant businesses and individuals were alter egos where plaintiff alleged the two defendant companies did not maintain separate or adequate corporate records; paid one company's invoices from the other's accounts; mingled cash between one of the companies and the individual defendants; used the same address for all defendants, corporate and individual; and failed to properly capitalize one of the businesses). This is insufficient to plead a claim for veil piercing or alter ego liability. See In re Marsden, 99 F. App'x 862, 866 (10th Cir. 2004) ("Although well-pleaded facts will be taken as true, conclusory allegations that lack supporting factual averments are insufficient to state . . . claim[s] on which relief can be based." (internal quotation marks omitted)). Because Plaintiffs have not sufficiently alleged facts showing "unity of ownership and interest," the Court does not have to determine whether Plaintiffs have demonstrated "use of the corporate form to perpetrate fraud or [other] wrong." Estate of Raleigh, 947 A.2d at 470 (internal quotation marks and citations omitted). The Court will not pierce the corporate shield and find Defendant Arase liable for Defendant TCG's alleged breach of the stock purchase agreement.[2] Accordingly, the Court must dismiss Plaintiffs' claims for breach of contract against Defendant Arase.

B. Fraud

---

[2] Although the Court will not hold Defendant Arase liable for TCG's breach or TCG's fraud, he can be held liable for his own tortious conduct, including fraud in the inducement.

9

Defendants argue that the Court must also dismiss Plaintiffs' causes of action for fraud against both Defendants. First, Defendants argue dismissal is appropriate because "Plaintiffs have wholly failed to plead fraud separate and apart from their breach of contract claim." (Defs.' Reply, Dkt. No. 21, at 4.) Defendant is correct that "[t]he wrong giving rise to a fraud claim must be independent of the breach of contract and the aggrieved party must allege damages that are separate from any harm caused by the breach of contract." Voorhis v. BOK Fin. Corp., Case No. 13-CV-197-CVE-TLW, 2013 WL 5937395, at *12 (N.D. Okla. Nov. 4, 2013); see also Wade v. EMCASCO Ins. Co., 483 F.3d 657, 675 (10th Cir. 2007) (applying Kansas law) (holding "the basis of the [fraud] claim must be different from the conduct upon which a breach of contract claim is based" and "the fraud must have resulted in damages greater than those caused by the breach of contract alone"). This means "'the facts alleged in [a plaintiff's] tort claim'" must be different than "'those alleged in [the plaintiff's] contract claim'" to support a separate claim for fraud. McGregor v. Nat'l Steak Processors, Inc., Case No. 11-CV-0570-CVE-TLW, 2012 WL 314059, at *3 (N.D. Okla. Feb. 1, 2012) (quoting Isler v. Tex. Oil & Gas Corp., 749 F.2d 22, 24 (10th Cir. 1984)). However, fraud claims "based on the formation of a contract, rather than the fact of [a party's] breach of contract" are "distinct" from claims for subsequent breach. Voorhis, 2013 WL 5937395 at *12.

Plaintiffs base the majority of their fraud claims on the representations set forth in the Stock Purchase Agreement relating to the accuracy of Defendant TCG's financial statements, lack of other contractual commitments, and lack of any knowledge indicating that TCG might

10

be unable to make the earn out payments according to the schedule in the parties' agreement. (Pls.' Resp., Dkt. No. 18, at 6-7.) Plaintiffs argue, however, that their fraud claims "arise not simply from breach," or subsequent violation of the contractual representations, "but from the inducement to enter into the contract, with the representations which are fraudulent appearing in the contract themselves and forming the basis for the contract." (Id. at 12.) The Court therefore concludes that Plaintiffs' claims of fraud—relating to Defendants' purported misrepresentations during the formation of the Stock Purchase Agreement—are separate and distinct from Plaintiffs' claims for breach of contract—dealing with Defendant TCG's distributions to Arase and an outside party and TCG's failure to pay Plaintiffs the agreed-upon earn out payments at the twenty-four and thirty-six month benchmarks.

Defendants also ask the Court to dismiss Plaintiffs' fraud claims as failing to satisfy the heightened pleading requirements in Fed. R. Civ. P. 9(b). Generally, under Rule 8(a)(2), a plaintiff needs to only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 9(b), however, requires a plaintiff "alleging fraud or mistake" to "state with particularity the circumstances constituting fraud or mistake." The Tenth Circuit has interpreted Rule 9(b) as requiring a plaintiff "to plead the 'who, what, when, where and how of the alleged [fraud],'" or "to identify the time, place, content, and consequences of the fraudulent conduct." United States ex rel. Lemmon, 614 F.3d at 1171 (quoting United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah, 472 F.3d 702, 727 (10th Cir. 2006)). Plaintiffs have satisfied this standard. The Complaint alleges that the named Defendants (who) made false representations to Plaintiffs during the

formation of the Stock Purchase Agreement (what and how) on or about June 1, 2010, when the parties entered into the Stock Purchase Agreement (when).  Although not a model of clarity, the Complaint provides the Defendants with fair notice of Plaintiffs' fraud claims.  Thus, dismissal on the basis of Rule 9(b) is inappropriate.  Because Plaintiffs' fraud claims survive Defendants' Motion to Dismiss, Plaintiffs' corresponding claim for punitive damages also survives.

### III.  CONCLUSION

Accordingly, the Court hereby GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss (Dkt. No. 14).

IT IS SO ORDERED this 16th day of April, 2014.

*[signature]*
ROBIN J. CAUTHRON
United States District Judge