IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RHONDA CLEMMER and DONNA REDDOUT, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. CIV-13-1335-C |
| THE COLUMBIA GROUP, INC., a District of Columbia Corporation, and MARTIN ARASE, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

This case arises out of a Stock Purchase Agreement ("SPA")[1] between Plaintiffs and Defendant The Columbia Group ("TCG"), executed on June 1, 2010. In that Agreement, Plaintiffs sold 100% of the interest in an Oklahoma corporation known as Eagle Systems and Services, Inc. ("Eagle"), to Defendant. In exchange, Defendant paid Plaintiffs $10 million, and agreed to pay Plaintiffs an additional contingent "earn out" of up to $4.8 million. The amount of the actual earn out paid was contingent upon the occurrence of certain conditions set forth in the purchase agreement. Specifically, Defendant TCG agreed to pay Plaintiffs 32% of the cumulative gross revenue of Eagle for the first 12, 24, and 36 months in the event that Eagle's gross revenue reached certain benchmark amounts designated in the Agreement.

---

[1] The SPA is but one part of several documents executed by the parties, including a Stock Pledge Agreement and a Subordination Agreement. The Pledge Agreement pledges shares of Defendant to Plaintiffs as security for the purchase of their company. The Subordination Agreement prioritized the right to payment from Defendant between Plaintiffs and SunTrust Bank. All documents were executed on the same date.

Consistent with the terms of the Agreement, Plaintiffs were paid the $10 million initial payment and an earn out payment of $1,974,605 for the 12-month earn out period. At that point, the relationship between the parties broke down. Finally, in December of 2013, Plaintiffs sued Defendants, asserting claims for breach of contract and fraud in the inducement. Defendants have now filed a Motion for Partial Summary Judgment seeking judgment as a matter of law on Plaintiffs' claim for fraud in the inducement and a determination that Plaintiffs cannot recover the maximum amount of earn out bonus.

## **STANDARD OF REVIEW**

Summary judgment is appropriate if the pleadings and affidavits show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "[A] motion for summary judgment should be granted only when the moving party has established the absence of any genuine issue as to a material fact." Mustang Fuel Corp. v. Youngstown Sheet & Tube Co., 561 F.2d 202, 204 (10th Cir. 1977). The movant bears the initial burden of demonstrating the absence of material fact requiring judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A fact is material if it is essential to the proper disposition of the claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If the movant carries this initial burden, the nonmovant must then set forth "specific facts" outside the pleadings and admissible into evidence which would convince a rational trier of fact to find for the nonmovant. Fed. R. Civ. P. 56(e). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." Celotex, 477 U.S. at

324. Such evidentiary materials include affidavits, deposition transcripts, or specific exhibits. Thomas v. Wichita Coca-Cola Bottling Co., 968 F.2d 1022, 1024 (10th Cir. 1992). "The burden is not an onerous one for the nonmoving party in each case, but does not at any point shift from the nonmovant to the district court." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 672 (10th Cir. 1998). All facts and reasonable inferences therefrom are construed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## **ANALYSIS**

According to Defendants, Plaintiffs' claims for breach of contract and fraud in the inducement rely on allegations of the same conduct and thus as a matter of law one claim must be dismissed. However, Defendants' assessment of Plaintiffs' claims is mistaken. Plaintiffs' claim for fraud in the inducement arises from Defendants' alleged failure to disclose the Buck Agreement.[2] On page 25 of Plaintiffs' Objection to Defendants' Motion for Partial Summary Judgment they state: "The Buck Agreement was material and Plaintiffs would not have entered into the contract had they known of the Buck Agreement." (Dkt. No. 88.) In contrast, Plaintiffs' claim for breach of contract relates to alleged misdeeds by Defendants after the Agreement was in place and the parties were operating under its terms. Thus, Defendants' argument that Plaintiffs' claim for fraud in the inducement must fail as a matter of law is in error. That being said, problems remain with Plaintiffs' claim.

---

[2] The Buck Agreement was made between Mr. Arase and Mr. Buck and related to a sale of Defendant. The validity and the effect of that agreement is in litigation in another forum.

3

1. Fraudulent Inducement

The Oklahoma Supreme Court has recognized that a party who has been fraudulently induced to enter into a contract has two remedies. First, rescission of the contract, or, second, affirmance and recovery of damages arising from the fraud. See Holcomb & Hoke Mfg. Co. of Indianapolis, Ind. v. Jones, 1924 OK 672, 228 P. 968. As the court explained, if a contract was fraudulently induced, it was void at its inception at the option of the party defrauded and if that party seeks to rescind the contract based on that fraud, he can no longer enforce any part of it and no action can be based on the contract itself. Id. In that instance, the defrauded party must, of course, return anything gained as a result of the contract. The Oklahoma Supreme Court recognized that in certain cases rescission would not compensate the loss of the party who has been, by fraud, induced to enter into the contract. In those instances, the party may retain what was received under the contract and seek remedy for damages arising from the fraud; however, the damages must be distinct and separable from any claim for breach of the contract. Id. In the case at bar, that would mean that Plaintiffs must establish damages arising from Defendants' failure to disclose the Buck Agreement that are separate from any claim of damages they are making for breach of contract.

Here, Plaintiffs assert that their expert has presented damage calculations based on several alternative theories. At this stage, the Court has not been presented with sufficient evidence to determine which, if any, of these theories of recovery would be permissible under the applicable law. Rather, the Court simply notes that any damages Plaintiffs seek to recover must be clearly distinguished from damages arising from the breach of contract

claim which is premised on Defendants' failure to make payments under the earn out clause. That is, Plaintiffs must demonstrate damages occurring solely because of the failure to disclose the Buck agreement. Any such damages must also account for the benefits that Plaintiffs have already received under the contract. Provided that Plaintiffs present competent evidence satisfying these conditions and the applicable Oklahoma law, they may present their fraud in the inducement claim to a jury. Defendants' Motion for Partial Summary Judgment on this issue will be denied.

2. Breach of Contract – Earn Out

The parties next dispute the amount due to Plaintiffs under the earn out clause in the SPA. Plaintiffs argue they are entitled to the maximum amount set out in the SPA of $4.8 million, less the payments already made. Defendants argue that Plaintiffs' damages are not in that amount. The operative portion of the Stock Pledge Agreement is § 9(a) which states:

> Rights of the Shareholders After Failure to Cure. After due notice and the failure of the Pledgor to cure the default, the Shareholders may, at their option, do any one or more of the following: (a) declare Non Cash Working Capital Amount and all Earn Out of Pledgor to the Shareholders to be immediately due and payable; (b) exercise any and all of the rights and remedies of a secured party as provided for by law; (c) proceed by an action or actions at law or in equity to recover the obligations secured hereby or to foreclose under the terms of this Agreement and sell the collateral, or a portion thereof, pursuant to a judgment or decree of a court or courts of competent jurisdiction; (d) proceed immediately to have any or all of the Pledged Stock registered in the Shareholders' names in equal shares or an assignee of the Shareholders; (e) enforce one or more remedies hereunder, successively or concurrently; and (f) proceed immediately to dispose of and realize upon the Pledged Stock, or any part thereof.

5

The first step in construing any term of a contract is to determine whether or not the phrase is ambiguous. See Bennett Enters., Inc. v. Domino's Pizza, Inc., 45 F.3d 493, 497 (D.C. Cir. 1995).[3] In determining whether a contract is ambiguous, the Court examines the document on its face, giving the language used its plain meaning, unless in context it is evident that the terms used have a technical or specialized meaning. Begg v. Continental Cas. Co. (In re May), 936 A.2d 747, 751 (D.C. 2007). The operative portion of § 9(a) that is in dispute is the meaning of "all Earn Out." Plaintiffs, focusing on the word "all," argue that the amount should be the $4.8 million, as that is the total amount of earn out that could possibly be earned. However, the phrase earn out must be defined in connection with the parties' use in other portions of the SPA. Notably, earn out is defined in § 2.6 of the SPA. That section sets forth how the amount of earn out should be calculated and notes that the earn out is contingent upon certain benchmarks or thresholds being reached before payment would be due. Rather than creating a liquidated damages amount, as suggested by Plaintiffs, the $4.8 million figure is clearly defined by the Agreement as nothing more than a maximum amount or cap on the damages that could be awarded. The actual amount of earn out due and payable may be substantially less than that amount. While the language of § 9 clearly grants Plaintiffs the right to accelerate and demand all earn out payments upon Defendants' default, it does not create a guaranteed recovery of $4.8 million. Rather, there must be a determination made of the amount of earn out due as a result of satisfaction of the thresholds

---

[3] The parties are in agreement that the terms of the SPA are governed by District of Columbia law.

set forth in the Agreement. Thus, Plaintiffs must offer evidence that the thresholds for each earn out were met before they may recover any payment.

Defendants argue that even if they were obligated to make additional earn out payments to Plaintiffs, they could not because of the terms of a separate Subordination Agreement. In that agreement, Plaintiffs agreed to subordinate their earn out payments to SunTrust Bank. Under the terms of the Subordination Agreement, Plaintiffs agreed that if certain events occurred, then any earn out payments to which they were entitled would be stopped and those payments would in turn be made to SunTrust in payment of the loan it had made. On July 24, 2010, SunTrust provided notice to Plaintiffs and Defendants that one or more suspension events had occurred. Plaintiffs do not dispute that this notice, pursuant to the terms of the Subordination Agreement, prevented any earn out payments to be made to them. Rather, Plaintiffs argue that the time period barring earn out payments, which they call the blockage period, has expired and therefore they are now entitled to be paid. Alternatively, Plaintiffs assert that because SunTrust has sold its interest in the loan to Essex, and Essex is a corporation owned solely and entirely by Defendant Arase, the Subordination Agreement is now meaningless.

After review of the relevant clauses of the various Agreements, the Court finds that Plaintiffs are not entitled to receive earn out payments. First, the sale by SunTrust to Essex does not terminate the Subordination Agreement. As Defendants note in their Reply, § 8 of the Subordination Agreement grants SunTrust the right to exchange, sell, or surrender its security interest without impairing or affecting the Agreement. Second, it is unnecessary at

7

this stage to determine the effect of the blockage or whether or not Essex has properly pursued its rights to collect under the Subordination Agreement. It is undisputed that the SunTrust/Essex loan has not been paid in full. As Defendants note, § 3 of the Subordination Agreement states that in the event there are any amounts collected by Plaintiffs from earn out or otherwise, those amounts shall be paid to the senior creditor, that is, SunTrust/Essex, in accordance with § 5. Thus, even were the Court to permit Plaintiffs to proceed and obtain earn out payments from Defendants, the amount of those payments would be required to be returned to Essex under the terms of the Subordination Agreement. The maximum amount Plaintiffs argue they are entitled to recover in earn out payments is $2,825,395. The amount due and owing to SunTrust/Essex exceeds that amount. Plaintiffs have offered no other benefit they would receive by virtue of forcing the payments to be made to SunTrust/Essex. Before Plaintiffs may proceed, they must have an entitlement to obtain a remedy or recovery. Because Plaintiffs cannot demonstrate such a right to recovery, Defendants are entitled to judgment on Plaintiffs' claim for earn out payments.

3. Attorneys' Fees

Plaintiffs argue the prevailing party in this action is entitled to recover attorneys' fees under § 20 of the Stock Pledge Agreement. Defendants assert that § 20 only applies to an action for breach of the Stock Pledge Agreement, and as Plaintiffs have not brought a claim on that Agreement, § 20 is inapplicable. Plainitffs respond, arguing that the Stock Pledge Agreement is incorporated into the SPA on which their claims are made and therefore § 20 provides for recovery of attorneys' fees.

As noted above, the SPA and its subordinate agreement are governed by District of Columbia law. Under that law, the Court should construe a contract "as a whole so as to give meaning to all of the express terms." Washington Metro. Area Transit Auth. v. Mergentime Corp., 626 F.2d 959, 961 (D.C. Cir. 1980). Applying this standard, the Court finds the attorneys' fees provision is inapplicable to Plaintiffs' claims. When all parts of the parties' agreements are examined, it is clear that the intent of the parties was to provide for attorneys' fees in the event certain provisions were breached and to not permit recovery of fees in the event other portions were breached. Here, Plaintiffs' claims are premised on breach of a portion of the Agreement that does not provide for attorneys' fees.

Plaintiffs' Motion to Strike Newly Attached Exhibits will be denied. To the extent the exhibits challenged by Plaintiffs were considered by the Court, Plaintiffs have had ample opportunity to counter Defendants' arguments related to the exhibits.

## CONCLUSION

For the reasons set forth herein, Defendants' Motion for Partial Summary Judgment (Dkt. No. 77) is GRANTED in part and DENIED in part. Plaintiffs' Motion to Strike Newly Attached Exhibits (Dkt. No. 99) is DENIED.

IT IS SO ORDERED this 31st day of December, 2014.

ROBIN J. CAUTHRON
United States District Judge